Venoia WRIGHT, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 94–21L.

United States Court of Federal Claims.

Sept. 13, 1994.

Leslie William Thornton, Tulsa, OK, for plaintiff.

Daniel G. Steele, Washington, DC, for defendant. Alan R. Woodcock, Dept. of the Interior, of counsel.

## OPINION

BRUGGINK, Judge.

This action, brought pursuant to the Tucker Act, 28 U.S.C. § 1491 (1988), is before the court on the Government's motion to dismiss. The motion is asserted under both RCFC 12(b)(1), lack of subject matter jurisdiction, and RCFC 12(b)(4), failure to state a claim upon which relief can be granted. After considering the parties' written and oral arguments, the court concludes that the action should be dismissed for failure to state a claim upon which relief can be granted.

## FACTUAL BACKGROUND [1]

Sam Tagg, a Cherokee Indian, died in 1952 leaving to his heirs a tract of land in Claremore, Rogers County, Oklahoma ("the Claremore property"). Plaintiff was named executrix of Tagg's estate and subsequently obtained power of attorney from the five other heirs involved.[2] Toward the end of 1986, prior to a determination of Tagg's heirs, she negotiated a three-year lease agreement on the Claremore property with Pipes, Inc. ("Pipes").

Although the lease agreement between plaintiff and Pipes was not approved by the Secretary of the Interior, Pipes immediately took possession and set up a smoke shop.[3] In December 1989, after renewed negotiations with plaintiff had reached an impasse, Pipes contacted two of the other heirs in an effort to continue the lease. As a result of these negotiations, Pipes entered into a lease agreement ("1990 lease") with Henry Tagg, Sr., and Callie Tagg–Horton which purported to permit it to continue its smoke shop operation on the Claremore property. Even though the remaining four heirs refused to sign the lease, this agreement was subsequently approved by the Superintendent of the local Bureau of Indian Affairs ("BIA") on January 11, 1990. Plaintiff alleges that the 1990 lease was executed in violation of applicable regulations requiring advertising, sealed bidding, and the posting of a surety bond. See 25 C.F.R. §§ 162.5, 162.7 (1990). Moreover, it was executed before the lapse of the three-month period within which heirs are allowed to attempt to reach agreement on lease terms. See 25 C.F.R. § 162.2(a).

On June 4, 1991, the BIA Area Director vacated the Superintendent's approval of the 1990 lease, finding that the Superintendent had no authority to approve such a lease under 25 C.F.R. § 162.2(a). This decision was affirmed by the Interior Board of Indian Appeals on April 2, 1992. Four weeks later, the Secretary of the Interior issued a cease-and-desist order to Pipes ordering it to terminate its smoke shop operation on the Claremore property. Despite this order, Pipes continued to operate its smoke shop until the decision of the Interior Board of Indian Appeals was affirmed by the United States District Court for the Northern District of Oklahoma. *Pipes, Inc. v. United States*, No. 92–C–373–B, 1992 WL 684917 (N.D.Okla.1992).

Plaintiff now seeks in excess of twenty-five million dollars from the United States Government as compensation for what she alleges are breaches of various fiduciary duties owed to her by the Secretary of the Interior. Plaintiff argues that she is entitled to these damages because of the BIA's improper approval of the 1990 lease and the Secretary's failure to remove Pipes from the property subsequent to the lease being found invalid.

## DISCUSSION

It is a fundamental precept of our judicial system that "[t]he United States, as sovereign, is immune from suit save as it

---

1. The facts are drawn from the complaint and plaintiff's briefing. The court assumes for the purposes of this motion that they could be proven.

2. These heirs were determined in June of 1989 by the District Court of Rogers County, Oklahoma. The heirs were: plaintiff; Henry Tagg, Sr.; Henry Thompson; Callie Tagg–Horton; Eunice Thompson–Hawes; and Edith Thompson–Jackson. They all had an interest in the Claremore property.

3. A store that specializes in the sale of tobacco products.

consents to be sued, and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 769–70, 85 L.Ed. 1058 (1941) (citations omitted). Plaintiff premises jurisdiction here upon the Tucker Act, which gives this court jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States...." 28 U.S.C. § 1491. However, the Tucker Act is "only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages." *United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976). Rather, the Act merely confers jurisdiction on this court when a substantive right to recovery exists. *Id.* The plaintiff must invoke a right to monetary relief that is found in some other source of law. The plaintiff must demonstrate that the source of substantive law she relies upon "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." *Eastport S.S. Corp. v. United States,* 372 F.2d 1002, 178 Ct.Cl. 599, 607 (1967).

Plaintiff contends that her substantive right to monetary compensation arises out of numerous sources: 25 C.F.R. Part 162 (Federal regulations dealing with the leasing of Indian land) ("Part 162"); Act of August 8, 1946, ch. 907, 60 Stat. 939 (Act permitting the Secretary of the Interior to delegate his powers in order to facilitate and simplify the administration of Indian affairs); Act of June 16, 1906, ch. 3335, 34 Stat. 267 (Act to enable the people of Oklahoma and of the Indian Territory to form a constitution and State government and be admitted into the Union on equal footing with the original states); 25 U.S.C. § 403 (1988) (dealing with leases of Indian lands held under a trust patent); 25 U.S.C. § 450m (Supp. V 1993) (dealing with the authority of the Secretary of the Interior to rescind certain Indian contracts).

Although these statutory and regulatory sources can arguably be viewed as creating a general trust relationship between the United States and Indian land owners, the court concludes for the following reasons that the complaint must be dismissed because none of the above sources can be fairly interpreted as making the Government susceptible to suits for monetary compensation for breach of trust.

■ The fiduciary relationship between the United States and individual Indians was addressed extensively in two related cases, *United States v. Mitchell,* 445 U.S. 535, 542–44, 100 S.Ct. 1349, 1353–54, 63 L.Ed.2d 607 (1980) ("*Mitchell I*"), and *United States v. Mitchell,* 463 U.S. 206, 219–26, 103 S.Ct. 2961, 2969–72, 77 L.Ed.2d 580 (1983) ("*Mitchell II*"). Although the cases reached different results, in combination, they hold that a trust relationship can exist between the United States Government and Indians. However, for that relationship to be enforceable through the remedy of an action for money damages, the relevant statutes and regulations must "unambiguously provide that the United States has undertaken full fiduciary responsibilities" as to the particular aspect of the relationship complained of. *Mitchell I,* 445 U.S. at 542, 100 S.Ct. at 1353.

In *Mitchell I,* individual allottees of land contained in the Quinault Indian Reservation sued the United States for monetary damages for the alleged mismanagement of timber resources found on Indian land. 445 U.S. at 537, 100 S.Ct. at 1351. The plaintiffs relied upon the General Allotment Act of 1887, ch. 119, 24 Stat. 388, as amended, 25 U.S.C. § 331 *et seq.* (1982), as the statutory source of their substantive rights against the Federal Government. *Id.* at 536–37, 100 S.Ct. at 1350–51. The Court emphasized the limited role that the Government was intended to play under the statutory scheme and concluded that this statute could not be fairly interpreted as mandating monetary damages against the United States because the Act "created only a limited trust relationship between the United States and the allottee that does not impose any duty upon the Government to manage timber resources." *Id.* at 542, 100 S.Ct. at 1353.

Three years later, the Court reached a different result in *Mitchell II.* The Court

held that under the timber management statutes, 25 U.S.C. §§ 406, 407, 466 (1982), and the regulations promulgated thereunder, 25 C.F.R. § 163 (1983), the Indian plaintiffs were entitled to monetary compensation from the United States for the Government's mismanagement of timber resources. *Mitchell II*, 463 U.S. at 226–28, 103 S.Ct. at 2972–74. The Court concluded that the statutes and regulations upon which the plaintiffs relied gave the Government full responsibility to manage Indian resources and land for the Indians' benefit. *Id.* at 224, 103 S.Ct. at 2971–72. The Government was given elaborate control over forests and property belonging to the Indians, and the relevant statutes and regulations required the Secretary of the Interior to manage Indian resources so as to generate proceeds for the Indians. *Id.* at 220–27, 103 S.Ct. at 2969–73.

According to the *Mitchell II* Court, "the timber management statutes and the regulations promulgated thereunder establish the 'comprehensive' responsibilities of the Federal Government in managing the harvesting of Indian timber. The Department of the Interior—through the Bureau of Indian Affairs— 'exercises literally daily supervision over the harvesting and management of tribal timber.' Virtually every stage of the process is under federal control." 463 U.S. at 222, 103 S.Ct. at 2971 (quoting *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 147, 100 S.Ct. 2578, 2585, 65 L.Ed.2d 665 (1980)). The Court distinguished *Mitchell I* by adding that "[i]n contrast to the bare trust created by the General Allotment Act, the statutes and regulations now before us clearly give the Federal Government full responsibility to manage Indian resources and land for the benefit of the Indians. They thereby establish a fiduciary relationship and define the contours of the United States' fiduciary responsibilities." *Mitchell II*, 463 U.S. at 224, 103 S.Ct. at 2971–72.

■ From these two decisions, it follows that allegations of breach of a general trust relationship arising out of the allotment statutes do not state a claim under the Tucker Act. The availability of a monetary remedy depends upon the extent of the role that the Government is to play in the statutory or regulatory scheme upon which plaintiff relies. What is required under *Mitchell II* is that the statutes and regulations defining the activity in question must show congressional intent to assume a trust relationship with specific contours. *See id.* at 222–26, 103 S.Ct. at 2970–73. The mere existence of a trust relationship "does not mean that any and every claim by the Indians 'necessarily states a proper claim for breach of the trust.'" *Cherokee Nat. of Oklahoma v. United States*, 21 Cl.Ct. 565, 573 (1990) (quoting *Pawnee v. United States*, 830 F.2d 187, 191 (Fed.Cir.1987)), *cert. denied*, 486 U.S. 1032, 108 S.Ct. 2014, 100 L.Ed.2d 602 (1988). The statutes and regulations at issue must be fairly susceptible to a construction that imposes particular fiduciary duties, the violation of which were contemplated to result in financial accountability. Something comparable to the "pervasive" management role present in *Mitchell II* must be alleged. 463 U.S. at 219–22, 103 S.Ct. at 2969–70.

■ Moreover, in the absence of a specific assumption of comprehensive fiduciary duties, the Government should not be presumed to act in the same capacity as a private trustee. *See Montana Bank of Circle, N.A. v. United States*, 7 Cl.Ct. 601, 613–14 (1985) (fiduciary obligations applicable to private trustees not applicable to United States); *see also Begay v. United States*, 16 Cl.Ct. 107, 127 n. 17 (1987) ("[T]he provisions relating to private trustees and fiduciaries, while useful as analogies, cannot be regarded as finally dispositive in a government-Indian/trustee-fiduciary relationship. . . .").

■ The complaint here presents a hybrid set of circumstances. Plainly, the general scheme of the allotment statutes and regulations creates no more than the sort of generalized rights and responsibilities present in *Mitchell I*. In order to give more substance and specificity to the Government's role here, however, plaintiff points to the federal regulations pertaining to the leasing and permitting of allotted Indian land set out in 25 C.F.R. Part 162. Among other powers granted, the Secretary of the Interior is permitted to authorize leases on individually-owned allotment land on behalf of certain categories of owners. 25 C.F.R. § 162.2. Of

specific importance to the plaintiff, the Secretary is given the authority to grant leases on behalf of "heirs or devisees to individually owned land who have not been able to agree upon a lease during the three-month period immediately following the date on which a lease may be entered into." 25 C.F.R. § 162.2(a)(4). The Secretary is also given the responsibility of approving all leases and subleases made pursuant to these regulations. 25 C.F.R. §§ 162.5, 162.12. Finally, the Secretary is obligated to abide by certain procedural requirements set forth in sections 162.5 and 162.7.

Plaintiff argues that this general involvement in leasing, along with the enumerated, specific duties create a pervasive Government involvement in the leasing of allotted land. This, in turn, gives rise to a fiduciary relationship that can be enforced through a breach of trust action. Plaintiff contends that the Government breached its duties when the Secretary's subordinates failed to satisfy the procedural requirements for the approval of leases set forth in 25 C.F.R. §§ 162.2 (waiting at least three months before imposing a lease on heirs unable to reach agreement), 162.5 (collection of surety bond), and 162.7 (advertising and sealed bidding). Plaintiff further alleges that the trust relationship was violated by the Secretary's failure to remove Pipes from the property upon the determination of the Interior Board of Indian Appeals that the lease was invalid.

After careful analysis of 25 C.F.R. Part 162, the court concludes that a monetary remedy is not appropriate here due to the extremely limited role played by the Government in the leasing regulations. None of the factors that were essential to the *Mitchell II* decision are found in the present case. The federal regulations dealing with leasing of restricted Indian land allotments do not give the Government an extensive role in the leasing process. Except for a few limited circumstances, such as the one here, the Government's role in leasing is limited to final review of leases negotiated by others. The Government has no generalized responsibility to manage allottees' lands or to see that they are productive. Short of alienation, allottees generally have broad powers to manage their own lands. *See Mitchell I,* 445 U.S. at 542–43, 100 S.Ct. at 1353–54; *see also Cherokee Nat. of Oklahoma,* 21 Cl.Ct. at 578. Once a lease is executed, the Secretary has no control over the lands leased or the monies collected under the leases. Nor does Part 162 impose a duty on the Secretary to ensure that the Indian land owners get the best lease possible or the most profitable lease arrangement. Rather, the Secretary is obligated only to make sure that no lease is approved at less than the present fair annual rental. 25 C.F.R. § 162.5(b).

Even if the court assumes, as it must for purposes of this motion, that the Secretary or his designees failed to comply with specific regulatory requirements, it does not follow that those requirements should be enforced by a damage remedy. These isolated obligations do not fit into a comprehensive management scheme such as that found in *Mitchell II.* The court is persuaded that the limited duties placed on the Secretary by Part 162 call for a correspondingly limited remedy, to wit, the right to challenge the offending leases through an administrative process that is reviewable in district court. This process is capable of protecting the allottees from improper leases, and its effectiveness is evidenced by the actual administrative outcome in this case.

Plaintiff cites a number of other provisions that, when considered in addition to Part 162, it contends collectively give rise to a monetary remedy for breach of trust. They do not alter the result. Most do not involve the United States' obligations under the leasing system set forth in the regulations. The Act of August 8, 1946, ch. 907, 60 Stat. 939, for example, merely authorizes the delegation of general powers to administer Indian affairs from the Secretary of the Interior to his subordinates. The Act of June 16, 1906, ch. 3335, 34 Stat. 267, is an enabling act authorizing the people of Oklahoma to adopt a state constitution and allowing them to enter the union as a state. Section 450m of Title 25 does not deal with the leasing of individually allotted Indian lands. It only gives the Secretary of the Interior authority to rescind contracts or grants involving Indian tribes or organizations. 25 U.S.C. § 450m. The last

source of statutory authority relied upon by the plaintiff is 25 U.S.C. § 403. Under this provision, leases of Indian allotments held under a trust patent must be "in conformity with such rules and regulations as the Secretary may prescribe, and the proceeds of any such lease shall be paid to the allottee or his heirs, or expended for his or their benefit, in the discretion of the Secretary." 25 U.S.C. § 403. In the absence of a regulation that can be construed to create a monetary remedy, the first clause of this section adds nothing to plaintiff's argument. The latter clause is not implicated here. Plaintiff does not contend she failed to receive her share of the proceeds of the leases.

## CONCLUSION

The federal statutes and regulations relied upon by the plaintiff cannot be fairly interpreted as creating fiduciary duties that can be enforced through a money remedy in this court. If the plaintiff has any right to be compensated for the time that Pipes was operating on the Claremore property under the improperly approved 1990 lease, that right is best explored in proceedings with the parties directly involved. The Clerk is directed to enter judgment dismissing plaintiff's complaint for failure to state a claim upon which relief can be granted. No costs.