THE NAVAJO NATION, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 93–763L.

United States Court of Federal Claims.

Feb. 4, 2000.

Paul E. Frye, Albuquerque, NM, for plaintiff.

R. Anthony Rogers, Washington, D.C., with whom were Assistant Attorney General Lois J. Schiffer and Kristine S. Tardiff, for defendant. Mary Jane Sheppard, Washington, D.C., of counsel.

## *OPINION*

BASKIR, Judge.

Mr. Donald Hodel, Secretary of the Interior during the critical period of this dispute, offered this denunciation of *ex parte* contacts in his deposition:

> The decision-maker isn't suppose (sic) to talk to one of the two sides while he is in the process of making a decision or may be in the process of making a decision. And it goes to fundamental fairness.

> \* \* \* \* \* \*

> I should go further in saying one other thing, that the *ex parte* communication taints the subsequent decision. So that even if you would have made exactly the same decision, you can never establish that, if you are challenged on it.

> So it's folly to engage in *ex parte* communications. And I would expect people who dealt with me inside and outside the Department would have known that I would have been pretty firm on that as a matter of practice.

Deposition of Donald P. Hodel, November 20, 1995; I Plaintiff's Appendix (Pl.App.) at 1149–50.

Although Mr. Hodel's memory fails him on this point, the evidence is overwhelming that he did what he condemns. On or about July 17, 1985, he met with a personal friend who had been hired a few days earlier, solely because of his access, by one party in a royalty dispute with the Navajo Nation. The Secretary sided with his friend's new employer in this brief *ex parte* meeting, a meeting which remained undisclosed for eleven years until revealed inadvertently during discovery in this case.

Mr. Hodel might well have added that *ex parte* contacts, especially those that result in decisions worth millions of dollars to the party with special access to high officials, betray the public trust and transgress the high ideals of public service. Not incidentally, by his conduct Mr. Hodel also violated basic fiduciary duties owed the plaintiff in this action, the Navajo Nation.

Mr. Hodel's July 1985 meeting forms the dramatic centerpiece in the Navajo Nation's suit for breach of trust and breach of contract against the United States. However, it is not the act which the plaintiff contends constitutes the government's specific wrongs. Both breaches allegedly arise from the entire series of events which ultimately resulted in the December 1987 approval by Mr. Hodel of royalty revisions to one of the Navajo Nation's coal leases with Peabody, the subject of that earlier meeting.

According to plaintiff, by this approval the Secretary breached fiduciary duties owed the Navajo Nation under the Indian Mineral Leasing Act of 1938, 25 U.S.C. § 396 *et seq.* (IMLA) and related treaties and regulations, and breached contractual obligations under the coal lease itself. The present matter comes before the Court on cross-motions for summary judgment on the issue of liability.

We conclude that the defendant, acting through former Secretary Hodel, violated the most basic common law fiduciary duties owed the Navajo Nation. Regrettably, we also conclude that the trust relationship necessary for our jurisdiction does not exist, and these violations do not mandate monetary relief, both as required by our jurisdictional precedents. We also conclude that the government owed no contractual duty to the plaintiff. We are thus compelled to deny plaintiff's motion for summary judgment and to grant the government's cross-motion.

*The Dispositive Motions In Context*

A number of related matters require mention at this early juncture to place this Opinion in context. In February 1999, prior to oral argument on these motions, the Navajo Nation filed a collateral lawsuit in United States District Court for the District of Columbia. *The Navajo Nation v. Peabody Holding Company, Inc., et al.*, No. CA–99–469–EGS (D.D.C.). Plaintiff named as a defendant, Peabody, the lessee at the heart of our case. Plaintiff's claims against Peabody evolve out of the same factual context. Also currently pending before our Court is Peabody's motion to find plaintiff in contempt in connection with the Navajo use in District Court of materials produced in discovery pursuant to a Confidentiality and Protective Order, entered February 26, 1996, in our litigation. Plaintiff subsequently filed a motion asking this Court to determine the status of those same materials, some of which plaintiff claims are not properly subject to the protective order.

In this Opinion, we no doubt make use of documents and information that are the subject of both these motions. However, in preparing this Opinion, we have relied only on the pleadings and other matters of public record. Those pleadings were received in unredacted form and were filed publicly. To this day, Peabody has not sought to apply the protective order to these filings and thereby remove them from the public domain. Although we reserve ruling on the motions respecting plaintiff's activities in District Court and the status of the protected documents, we view any objection by Peabody to inclusion of protected documents in this Opinion as waived.

### SUMMARY OF ISSUES

At issue in plaintiff's first claim for relief is the scope of the Secretary's fiduciary duties, if any, under IMLA. Do those duties establish a trust relationship between the United States and the Navajo Tribe the violation of which gives rise to a claim for money damages in this Court? The Navajo Nation has asserted that the statute imposes a host of strict fiduciary duties upon the government and that each of those duties has been clearly

breached. In particular, the Navajo Nation contends the statute imposes a fiduciary obligation to maximize the financial returns from coal leases; in this case, a fiduciary duty to require a twenty percent royalty rate for the Peabody lease. The Secretary's 1987 approval of a rate of 12.5 percent violates this duty.

The government counters that plaintiff's claim is not properly before the Court. First, plaintiff has failed to establish subject-matter jurisdiction in this Court. The trust relationship imposed by IMLA is of so limited a nature, it argues, that it cannot serve as the basis for a claim for money damages. Second, the Navajo's claim is barred by the statute of limitations. Failing those arguments, the government maintains that it is entitled to summary judgment because the Secretary satisfied any fiduciary duties owed the Navajo Tribe.

With the Navajo's second claim for relief, breach of contract, the Court faces issues of fundamental contract formation. Plaintiff alleges that the Secretary violated the pertinent coal lease to which the government was a party when he failed to provide a "reasonable adjustment" of the royalty according to the lease provisions, twenty percent being that reasonable adjustment. In the alternative, plaintiff argues under a contract implied-in-fact theory that the government failed to act in good faith and treat the parties fairly in reviewing and approving lease amendments between the Navajo Nation and the private parties involved in this dispute.

The government denies that the lease formed any contractual relationship between the Secretary and the Navajo Nation. Alternatively, defendant argues that to the extent any contractual duties have been created, the Secretary has sufficiently carried them out. Furthermore, defendant alleges that the breach of contract claim, like the breach of trust claim, is barred by the six-year statute of limitations.

The Court finds the government's statute of limitations argument without merit. However, the statutory and regulatory provisions upon which the Navajo Nation relies are not

"money-mandating" as required under the Tucker Act, 28 U.S.C. § 1491 (1988), or the "Indian Tucker Act," 28 U.S.C. § 1505 (1999), to invoke the jurisdiction of this Court and to afford the requested relief.

Plaintiff's breach of contract theory is equally unavailing. As we will explain, the Court finds as a matter of law that the Secretary is not a contractual party to the lease in question.

## BACKGROUND

A firm grasp of the extensive history of this case is indispensable to an understanding of the trust relationship between the United States and the Navajo Tribe in the mineral leasing context. The parties have spared no detail in describing the background of this case in their briefs and argument. The Court held two hearings on dispositive motions, the first of which exceeded five hours. For the most part, the following series of events is undisputed, and subject only to interpretation.

### Introduction

On February 1, 1964, the Navajo Nation, a federally recognized Indian tribe, entered into Lease 8580 with the Sentry Royalty Company for the mining of coal on tribal lands. Pursuant to the Indian Mineral Leasing Act the Assistant Area Director of the Bureau of Indian Affairs (BIA) approved the lease on August 28, 1964, under authority delegated by the Secretary of the Interior.

The original lease provided for an extremely low royalty rate of not more than 37.5 cents per ton, but Article VI allowed the Secretary or his delegate to adjust the royalty rate to a "reasonable" level on the twentieth anniversary of the lease. Ultimately the Secretary did not exercise this authority. Instead, on December 14, 1987, he approved amendments to the lease, negotiated by the parties, establishing a royalty rate of 12.5 percent.

A few years earlier, in anticipation of the maturity of Article VI, the Navajo Nation had instituted proceedings in the Department of Interior (DOI) with a view toward converting the royalty to a percentage basis, and dramatically boosting its level. At this time, the rate for coal leases on federal lands was 12.5 percent, which the Navajo considered a minimum. Indeed, the first-level DOI authority's initial decision in June 1984 was to increase the royalty to a rate of twenty percent. The lessee, Peabody Coal Company, Sentry's successor in interest, appealed that decision.

By mid-summer 1985 it was apparently well-known to all parties that the BIA planned to deny the appeal and affirm the twenty percent rate. The Secretary then intervened and directed that the decision on Peabody's appeal be deferred so that the parties to the lease could negotiate a royalty rate. This directive, the events leading up to it, and the Secretary's subsequent approval of a lease package the parties negotiated, form the basis of plaintiff's breach of trust and contract claims. With this outline in mind, we now examine the events and their legal context in more detail.

### Basis of Trust Relationship

Two treaties—the 1849 Treaty and the 1868 Treaty—form the foundation of the trust relationship between the United States and the Navajo Nation. See 9 Stat. 974; 15 Stat. 667. Under the 1849 Treaty, the United States assumed the responsibility to regulate trade and intercourse with the Navajo and to secure their permanent prosperity and happiness.

The principles of the treaties were echoed in the policies and procedures established by the United States. The BIA was established as an agency within DOI in order to encourage and train Indians to manage their own affairs and to utilize fully their natural resources under the trust relationship. As early as 1975 it was DOI policy to provide technical assistance to assure that development of coal resources provided a fair monetary return. Furthermore, the Code of Federal Regulations and departmental manuals governing the affairs of Interior and its agencies establish procedures intended to prevent private industry from exploiting Native Americans in the management of their resources. These measures range from placing limitations on the tribe's negotiations to providing technical and economic support for mineral management.

*The Royalty Rate Revision of Lease 8580*

The cents-per-ton basis of determining royalties under the original 1964 lease was, by any measure, an inequitable deal for the mineral owner. In fact, in 1977 Congress set a 12.5 percent minimum royalty rate for federal strip-mined coal, and the Department of the Interior adopted a policy prohibiting the federal trustee of Indian coal from approving a tribal coal lease with royalties less than that amount.

During this same period, it was noted that Lease 8580 violated several of the limitations later put in place by the DOI and BIA. Economic studies, some commissioned by federal agencies, confirmed that the royalty rate was not providing the Navajo a fair return for their coal. It is in this context that on June 18, 1984, Donald Dodge, the BIA Navajo Area Director, implemented Article VI and significantly raised the royalty rate to twenty percent. This decision was made under delegated authority of the Secretary of Interior, and in consultation with the Department of Justice.

*Appeal of the Rate Adjustment*

Not surprisingly, the prospect of such a significant increase in the cost of coal concerned Peabody and its major utility customers, Southern California Edison Company and the Salt River Project Agricultural Improvement and Power District (collectively, the "companies"). The companies appealed the Area Director's decision formally in July 1984. However, the record also establishes parallel *ex parte* attempts on behalf of industry representatives to communicate with those deciding the appeal. Whether these attempts sought to overturn the adjusted rate or merely to defer the decision on appeal is not clear. What is clear is that they were rebuffed by then-Secretary William P. Clark, who had a firm policy against *ex parte* meetings. The Navajo were apparently not apprised of the efforts.

John Fritz, Acting Assistant Secretary of Interior for Indian Affairs, the decision-maker on Peabody's appeal, took the matter under consideration. In March 1985, Mr. Fritz granted the companies' petitions to supplement their briefs, and asked them for additional cost, revenue and investment data.

This request apparently led the companies to suspect that the decision was going to be favorable to the Navajo.

On April 16, 1985, the Supreme Court decided *Kerr–McGee Corp. v. Navajo Tribe of Indians,* 471 U.S. 195, 105 S.Ct. 1900, 85 L.Ed.2d 200 (1985). That case upheld Navajo taxes that had been contested by the companies, and supported the Navajo Nation's position that it was entitled to obtain maximum revenues from its mineral leases. This confirmation of tribal authority no doubt concerned the companies, and arguably improved the bargaining position of the Navajo, who had broken off negotiations on lease amendments in November 1984 to await a decision on the appeal.

In June 1985, the decision document affirming the Area Director's decision awaited Mr. Fritz's signature. The companies learned that a decision affirming the twenty percent adjustment was imminent. On July 5, 1985, Peabody wrote a letter to Secretary Hodel requesting he postpone decision on the appeal and force the Navajo to negotiate. This letter was provided to the Navajo Nation, which promptly rejected further negotiations and urged DOI to decide the appeal with all deliberate speed.

However, the Navajo were not made aware of other lobbying efforts aimed at delaying the rate decision. Early in July 1985, Peabody retained Stanley Hulett, a former high-level DOI employee and close personal friend of the new Secretary. Mr. Hulett had been recommended by Southern California Edison Company, one of the power plant customers which relies upon the coal mined by Peabody. There is little doubt that Mr. Hulett met with Secretary Hodel, probably on July 17. On July 22, 1985, a Peabody attorney named Edward Sullivan drafted an internal company memorandum describing what transpired in the meeting. The memorandum demonstrates that even Peabody attorneys speculated on "whether this activity would be considered an '*ex parte*' contact as part of Peabody's appeal of the Navajo Area Director's decision." *See* I Pl.App. 595–96.

On or shortly after the date of the *ex parte* meeting, Secretary Hodel signed a memoran-

dum prepared by Peabody, making only one insignificant change in the company's draft. Copies of the draft and the version signed by the Secretary are attached as appendices to this Opinion.

In the memorandum, melodramatically described by a former DOI official as a "march or die" order, Secretary Hodel instructed Mr. Fritz not to issue the appeal decision affirming the twenty percent rate. Instead, he adopted the companies' preference and directed negotiations. Mr. Fritz, who subsequently made no secret of his sympathy for the Navajo Nation and his unhappiness with these developments, resigned in August, pursuant to an earlier decision.

Secretary Hodel's directive was not revealed to the Navajo Nation. Instead, on August 29, 1985, well after the Secretary's order deferring the rate decision in favor of negotiations, the Navajo Nation was informed or, more accurately, misinformed:

> The Secretary has received your letters dated July 19, July 5, and July 11, 1985, and has asked me to respond. Your letters concern an appeal by Peabody of the Navajo Area Director's decision adjusting the royalty rate on a Navajo coal lease with Peabody.
>
> As you are aware the briefing schedule has been completed and a *decision on the appeal is currently being considered* by the Deputy Assistant Secretary—Indian Affairs and his staff. They are aware of both Peabody's and the Tribe's concerns regarding settlement but *the decision has not yet been finalized.*

I Pl.App. at 622 (Letter from Tim Vollman, Associate Solicitor, Indian Affairs)(emphasis added).

Events then moved at a rapid, albeit puzzling pace. Despite the apparently imminent favorable decision on their twenty percent rate adjustment, in the face of an eight year history of desultory negotiations with the companies, and despite a firm refusal reiterated just a month earlier to resume talks pending a decision on the Dodge royalty adjustment, the Navajo Nation changed course immediately and dramatically.

Promptly upon receipt of Mr. Vollman's letter, the Navajo Nation abandoned its five-year effort to have the rate revised by the DOI, and on August 30, 1985, resumed discussions with Peabody that had broken off a year earlier. They quickly reached a tentative agreement within a month, by September 23, 1985. This agreement, negotiated under the auspices of Chairman Peterson Zah, was noteworthy for its adoption of the 12.5 percent federal royalty rate, nowhere near the twenty percent rate under appeal. The agreement initially failed to get Tribal Council approval, but it survived without major change an insurgent victory by Peter MacDonald later that year for Navajo Nation leadership. (MacDonald, as Chairman, had begun negotiations with Peabody back in 1979). In late 1987, essentially the same agreement was formally approved by the Navajo Nation and referred to DOI for review.

The abrupt abandonment of their effort to have DOI set a high royalty rate at the moment of its apparent success, and the Navajo Nation's return to negotiations they had broken off and had steadfastly refused to resume, defy explanation on this record. So does the breathtaking speed with which the parties reached an agreement that had eluded them for so many years. The record is bare of any formal communication by the Navajo Nation on the status of the appeal between September 1985 and December 1987, although there is a suggestion of an isolated and unsuccessful inquiry in 1986 or 1987.

The Navajo Nation has denied contemporaneous knowledge of the Hodel–Hulett meeting or its results. At most they admit that "someone from Washington" had urged a return to the bargaining table. No less intriguing and unexplained is the fact that the agreement reached in September 1985, with its 12.5 percent rate, survived without change in the face of political upheavals in the Navajo Nation leadership.

### The Negotiated Amendments

Apparently the favorable decision in *Kerr–McGee* prompted Mr. Zah to expand the scope of negotiations on the royalty rate adjustment to other topics such as tax matters. Consequently, the renegotiated agree-

ment encompassed not only a 12.5 percent royalty on Lease 8580, but confirmed the validity of tribal taxation. It also raised the royalty rate to 12.5 percent on two other leases which were not by their terms subject to rate revision. The agreement also addressed ancillary matters such as provisions for future royalty adjustments, arbitration procedures, rights of way, the establishment of a tribal scholarship fund, and the payment by Peabody of back royalties, bonuses, and water payments. And, as the government points out, the agreement obviated a long, costly and uncertain legal challenge by Peabody.

Soon after a tentative agreement had been reached, the tribal leadership passed to Peter MacDonald, who quickly reached essentially the same deal with the companies by the fall of 1985, preserving the adjustment of the royalty rate at 12.5 percent. The Navajo Nation forfeited $33 million in back taxes and $56 million in back royalties. The tax increases that the companies would likely face in light of the *Kerr–McGee* decision were capped at eight percent. The effect of these provisions would thus permit the tribe to realize as much as 20.5 percent yield in royalties and taxes combined.

*Approval of Negotiated Lease Amendments*

The agreement reached by the successive Navajo Nation administrations remained fixed for over two years. It was conditioned upon the approval of this same rate for another lease, Lease 5743, which was a joint enterprise of the Navajo Nation and Hopi. This lease did not provide for any rate revisions. The Hopi approved that lease's amendment in July 1986. The amendments were formally placed before the Navajo Nation Tribal Council and approved by that body in August 1987. Subsequently, Peabody and the Navajo executed the amendments, making them ripe for Secretarial review pursuant to the IMLA. Although the parties do not raise the point, we would be surprised if the Department was not fully apprised of the draft months, if not years, earlier.

On November 26, 1987, the agreement was officially forwarded to DOI for its review and approval as required by IMLA. Given the twenty-year history of Lease 8580 under the previous provisions and the long negotiating process ultimately resulting in the new lease terms, the facts indicate a relatively quick review process of a few days over the Thanksgiving holiday. Plaintiff condemns this "rush job" and notes that a flawed economic analysis of the lease amendments was performed as part of the review process. And one of the officials in the DOI to whom the amendments were sent for review, Mr. Frank Ryan, refused to sign his approval because he felt he "would be participating in a breach of trust." Deposition of Frank Ryan, November 7, 1995; III Pl.App. at 1510.

On December 14, 1987, the Secretary formally approved the lease amendments. The recommendation accompanying the endorsement asserted as a basis for approval "that the parties ha[d] negotiated at arm's length, in good faith to reach [the] amendments." Four days after the approval, the BIA Navajo Area Director's royalty adjustment of twenty percent, dating back to June 18, 1984, was formally vacated.

## DISCUSSION

### The Statute of Limitations

Plaintiff filed this case on December 14, 1993, the sixth anniversary of the Secretary's approval of the lease amendments. The government does not agree that the statute of limitations begins to run with the Secretary's approval. The government argues that to the extent plaintiff's claim is based on the Secretary's actions in July, 1985, the claim is time-barred under the six-year statute of limitations. *See* 28 U.S.C. § 2501 (1999). We reject that position for two independent reasons: (1) the Navajo Nation's cause of action had not yet accrued in July, 1985; and (2) the Secretary's conduct remained secret until after the Navajo Nation's complaint was filed.

■ Accrual of a cause of action occurs "when all events which fix the government's liability have occurred *and* the plaintiff was or should have been aware of their existence." *Hopland Band of Pomo Indians v. United States,* 855 F.2d 1573, 1577

(Fed.Cir.1988)(emphasis in original); *Kinsey v. United States*, 852 F.2d 556, 557 n. * (Fed.Cir.1988); *see also, Sankey v. United States*, 22 Cl.Ct. 743 (1991)(statute begins to run when underlying facts of claim become known or knowable to plaintiff), *aff'd* 951 F.2d 1266, 1991 WL 260869 (1991). In our view the events that transpired in July 1985 initiated a course of conduct that was complete only with the challenged approval of December 1987. The government does not contend any claim based on the 1987 approval is barred. *See* Def. Clarification of Certain Proposed Findings of Fact at 1–2. The Navajo Nation's claim cannot be barred while events that directly affect the rights asserted have yet to take place.

▪ Further, when the Navajo Nation filed its complaint it was unaware, through no fault of its own, of the July 1985 events. The complaint challenged the December 1987 approval. The statute of limitation does not run against a plaintiff who is unaware of a cause of action, whether because the defendant concealed the actions or because the injury was inherently unknowable at that point in time. *LaMear v. United States*, 9 Cl.Ct. 562, 569, *aff'd*, 809 F.2d 789 (Fed.Cir. 1986) (citations omitted.) The parties' submissions concerning the events following the Hodel–Fritz memorandum reveal no evidence that the Navajo Nation was aware of the memorandum or the meeting that produced it. Speculation aside, the Navajo Nation states it first became aware of the Secretary's July 1985 decision in 1994, but they offer no specifics. The Sullivan memorandum debriefing the meeting and its antecedents, was not produced until January 31, 1997. The government has not rebutted the Navajo Nation's claim that it was unaware of Secretary Hodel's actions before this.

Unaware of the earlier events, the Navajo Nation initially urged in its complaint that the December 1987 approval itself constituted a breach of trust. Having learned more from discovery—that is, after all, the purpose of discovery—the Navajo Nation now argues that the 1987 approval was tainted by the July 1985 events, among other things. The statute of limitations is intended to avoid the prosecution of stale claims which might prejudice the defendant; it does not preclude early evidence supporting timely claims. *Sankey*, 22 Cl.Ct. at 747 (citations omitted). Had the Navajo Nation sued for breach of trust in 1985, the government could persuasively have argued that the claim was not yet ripe for this Court's review.

### *Standard of Review*

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Cincom Systems, Inc. v. United States*, 37 Fed.Cl. 663, 670 (1997). In its consideration of motions for summary judgment, the Court relies upon the pleadings, depositions, answers to interrogatories, answers to admissions, and affidavits, and especially in jury cases, resolves all reasonable inferences in the light most favorable to the non-moving party. RCFC 56(c). Where, as here, both parties have moved for summary judgment as to plaintiff's fiduciary claim for relief, it is incumbent upon the Court to evaluate each motion on its own merits. *Kanehl v. United States*, 38 Fed.Cl. 89, 98 (1997)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Although the existence of a dispute on a material fact would defeat a summary judgment motion, there are, as we have said, no such disputes.

### *Breach of Trust Claim*

▪ The relationship between the United States government and Native American tribes is a fiduciary one, with the United States serving as trustee for the Indians. This trust was first created when the government entered into treaties with Indians concerning the use and occupation of tribal lands. The Navajo Nation, like other tribal governments, has reserved the right to live off of the bounty of their natural resources while entrusting the government to develop those resources in order to secure the prosperity of the Indians. Although the fiduciary relationship between Native Americans and the federal government is not necessarily described by the common law of trusts, we find it useful first to measure the government's actions against this familiar standard.

The standards governing private fiduciaries and their beneficiaries provide effective analogies in the Indian claims context. *Nevada v. United States,* 463 U.S. 110, 127, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983); *Mitchell v. United States,* 229 Ct.Cl. 1, 14, 664 F.2d 265, 274 (1981), *aff'd,* 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983); *Begay v. United States,* 16 Cl.Ct. 107, 127 n. 17 (1987).

### Breach of Trust in Court of Equity

The basic duties owed a beneficiary by a trustee are clear—care, loyalty, and candor. A trustee must use reasonable skill and care both to preserve the trust property and to make it productive. *See generally,* RESTATEMENT (SECOND) OF THE LAW OF TRUSTS §§ 174–76, 181 (1959). Furthermore, a trustee is obligated to administer the trust solely in the interests of the beneficiary, over the interests of third parties and even over those of the trustee, itself. *Id.* at § 170. Finally, both of these duties implicate a third responsibility of the trustee—the obligation "to communicate to the beneficiary material facts affecting the interest of the beneficiary which [the trustee] knows the beneficiary does not know and which the beneficiary needs to know for his protection in dealing with a third person with respect to his interest." *Id.* at § 173, Comment d. Needless to say, a fiduciary may not deal in secret with a third party to his beneficiary's detriment. Collectively, these duties call for the trustee continually to show good faith and fair dealing. *See generally,* GEORGE GLEASON BOGERT AND GEORGE TAYLOR BOGERT, THE LAW OF TRUSTS AND TRUSTEES §§ 541, 543–44 (2d ed. rev.vol.1993).

Let there be no mistake. Notwithstanding the formal outcome of this decision, we find that the Secretary has indeed breached these basic fiduciary duties. There is no plausible defense for a fiduciary to meet secretly with parties having interests adverse to those of the trust beneficiary, adopt the third parties' desired course of action in lieu of action favorable to the beneficiary, and then mislead the beneficiary concerning these events. Even under the most generous interpretation of the series of events leading up to the approval in December 1987 of the renegotiated lease package, the Secretary of Interior violated his common law fiduciary responsibilities.

The government argues that the settlement package ultimately approved gave the Navajo a *quid pro quo* for any reduction in the royalty rate. This argument has some appeal when we consider that the Navajo requested the Secretary to approve the lease amendments. After all, the Secretary also must consider the right of tribes to govern their own affairs, which includes making intelligent choices such as trade-offs in royalties for other economic benefits. At oral argument, plaintiff conceded that there are many aspects of the renegotiated lease package that are favorable to the Navajo Nation—counsel informed the Court that the Navajo did not wish to invalidate the entire agreement.

But we do not have to look to the end result to find a breach—the road to approval of the amendments is much more disturbing. A fiduciary's breach is not negated by a favorable end result; it requires full disclosure and ratification, both absent here. *See* BOGERT, *supra,* § 543 at 247 n.18 ("in the application of the loyalty rule to fiduciaries the courts are not concerned with the question of actual damage to the beneficiaries in the case at hand, but rather in the preventative aspects of the rule and with the possibilities of loss in trust administration in general.") (citation omitted); *cf.* REST. 2D, *supra,* §§ 213 and 216. Even if the 1987 approval was a correct outcome, Secretary Hodel has accurately observed "that the *ex parte* communication taints the subsequent decision ... even if you would have made exactly the same decision." Hodel Dep., I Pl.App. at 1149–50.

Entirely independent of whether profits were maximized, the Secretary and members of the Department engaged in *ex parte* communications with private industry at the expense of the Navajo, the beneficiary of the trust relationship. Then after very briefly reviewing the merits of the proposals, the Secretary approved lease amendments with royalty rates well below the rate that had previously been determined appropriate by those agencies responsible for monitoring the

federal government's relations with Native Americans.

Defendant argues that in suspending Mr. Fritz' proposed ruling, the United States simply allowed the Navajo Nation to exercise its sovereignty in negotiating terms for the Lease 8580 amendments and in gaining additional ground through the bargain regarding other leases and tax matters. The same rationale is asserted as the justification for the Secretary's approval of the amendments—the Secretary was hesitant to intrude upon "arms length negotiations."

A negotiator's weapon is knowledge. On this record, we can only conclude the Navajo entered the process unarmed with critical knowledge. Clearly, with Mr. Dodge's twenty percent royalty adjustment and Mr. Fritz' pending endorsement of that adjustment, the Navajo Nation had the upper hand for any negotiated settlement. In August 1985, when it resumed negotiations with the companies, the Navajo Nation no longer enjoyed the benefit of the threat that the twenty percent royalty rate was about to be affirmed.

Worse yet, the Navajo Nation was not aware that it no longer had this competitive edge in its bargaining, while the companies were well aware of the fact. In its late August 1985 response to the Navajo's inquiry on the matter, the Department of Interior had represented that the decision had not yet been made. The correspondence made no mention of the *ex parte* contacts or the fact that the Secretary had already determined to defer decision on the appeal in favor of negotiations. Unaware that the Secretary had already promised their opponents he would not decide the dispute, the Navajo Nation, arguably already at a competitive disadvantage, could not truly be said to have negotiated from a position of equality with Peabody and the utilities that purchased the Indian coal.

Incidentally, we imply no comment on the actions of Peabody or any of the other private interests involved. Plaintiff has sued them in District Court, where the appropriateness of the *ex parte* efforts to influence Messrs. Hodel and Fritz may ultimately be determined. But that would not change our view of the official government conduct in this matter. For as Justice Benjamin N. Cardozo observed prior to his appointment to the Supreme Court, "[m]any forms of conduct permissible in a workaday world for those acting at arms length, are forbidden to those bound by fiduciary ties." *Meinhard v. Salmon,* 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928). Subsequent events do not obviate our expectation that the Secretary's conduct be "kept at a level higher than that trodden by the crowd." *Id.* at 547.

The Court finds that the United States violated the most fundamental fiduciary duties of care, loyalty and candor. These violations, serious as they are, do not themselves confer jurisdiction on this Court, nor entitle plaintiff to money damages. Were this a court of equitable jurisdiction considering a private trust, plaintiffs might easily qualify for remedies typically afforded wronged beneficiaries. *See, e.g.,* BOGERT, *supra,* § 963 at 48 (suit for accounting and damages based on breach of trust normally brought in court of equity). But a greater showing is required to warrant a remedy in this Court.

### Breach of Trust in the Court of Federal Claims

In order to succeed in litigation in this Court, the plaintiffs must show that IMLA imposes specific fiduciary duties on the government, as opposed to general duties, and that the United States violated a specific fiduciary duty which Congress intended to compensate with money damages. If plaintiff fails to meet these requirements, we must reject its complaint for want of jurisdiction or failure to state a claim, or on summary judgment. While these are conceptually different issues, they tend to merge, especially in this case.

■ This Court's jurisdiction requires that the substantive right to monetary recovery be found in some source of law, independent of the Tucker Act, 28 U.S.C. § 1491, or the Indian Tucker Act, 28 U.S.C. § 1505. *United States v. Mitchell,* 463 U.S. 206, 212, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983)(*Mitchell II*); *United States v. Testan,* 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). Plaintiff

asserts as its independent basis the trust duties that are created by IMLA. Therefore, pursuant to 28 U.S.C. §§ 1491 and 1505, plaintiff must convince this Court that IMLA can fairly be interpreted as mandating monetary damages from the United States for the violations it claims. *Mitchell II*, 463 U.S. at 218, 103 S.Ct. 2961.

■ While it is not necessary that the statute explicitly state the right to damages, the government's obligation to pay must be clear and strong. *Cape Fox Corp. v. United States*, 4 Cl.Ct. 223, 232 (1983). The mere existence or even the breach of a limited trust relationship between the government and an Indian tribe does not establish a claim for money damages within the meaning of the Tucker Act. *United States v. Mitchell*, 445 U.S. 535, 542, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980)(*Mitchell I*). It is for this reason that the serious fiduciary abuses we identified earlier are insufficient to afford relief in this Court in and of themselves. *See Montana Bank of Circle, N.A. v. United States*, 7 Cl.Ct. 601, 613–14 (1985)("The general trust relationship in itself does not impose such duties as are erected in a complete trust with fully accountable fiduciary obligations. When the source of substantive law intended and recognized only the general, or bare, trust relationship, fiduciary obligations applicable to private trustees are not imposed on the United States.") To establish a "complete" fiduciary duty, there must be more than simply a process that was "designed to protect Indians by subjecting their contracts with third persons to the prior examination and approval of the Secretary of the Interior". *Id.* at 614. To serve as a basis for jurisdiction, the trust responsibility must mandate particular monetary relief upon the basis of statute, treaty, or assumption by the government of the task of managing economic assets.

Since no authority relied upon by plaintiff explicitly provides for monetary relief, we look toward the level of management and control that the government has assumed over coal leases under IMLA. Whether the trust responsibility the Secretary is alleged to have violated is "money mandating" can only be determined by evaluating the under-

lying statutory scheme. *See, e.g., Mitchell II*, 463 U.S. at 224, 103 S.Ct. 2961. Accordingly, we review IMLA and the regulations promulgated pursuant thereto, and then compare them to cases applying the *Mitchell* tests.

*The Indian Mineral Leasing Act of 1938*

The Indian Mineral Leasing Act of 1938, provides:

> On and after May 11, 1938, unallotted lands within any Indian reservation or lands owned by any tribe, group, or band of Indians under Federal jurisdiction ... may, *with the approval of the Secretary of the Interior,* be leased for mining purposes, *by authority of the tribal council or authorized spokesman for such Indians,* for terms not to exceed ten years and as long thereafter as minerals are produced in paying quantities.

25 U.S.C. § 396a (emphasis added). The remainder of the Act is very general, providing for the acceptance of surety bonds by the mineral lessee (25 U.S.C. § 396c), the promulgation of rules and regulations governing mining operations (25 U.S.C. § 396d), and the delegation by the Secretary of lease *approval* authority (25 U.S.C. § 396e). We note, however, that the legislation also contains separate provisions, more exacting requirements if you will, for the leasing of oil and gas. *See* 25 U.S.C. §§ 396b, 396d, 396g; *see also, Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation v. Board of Oil and Gas Conservation*, 792 F.2d 782, 796 (9th Cir.1986)(in reviewing Secretary's duties respecting oil and gas leasing, Court observed that IMLA "imposes extensive responsibilities on the government in tribal mineral leasing matters for the benefit of the Indians."); *accord, Jicarilla Apache Tribe v. Supron Energy Corp.*, 728 F.2d 1555, 1564–65 (10th Cir.1984).

■ We recognize that in enacting IMLA, the United States assumed the responsibility to manage minerals such as coal in a fiduciary capacity. *See Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 764, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985)(leasing procedures detailed by Congress intended to protect the Indians). In fact, the measure was passed in part because existing law was

considered inadequate to give the Indians the greatest return from their property. S. REP. No. 75–985 (1937). Other purposes in enacting the legislation were to achieve uniformity in tribal leasing and to increase Indian authority in granting leases. *Id.* In general, then, IMLA imposes upon the federal government a fiduciary obligation to develop a mineral leasing program which would provide the highest possible financial return to the Indians. *Navajo Tribe of Indians v. United States*, 9 Cl.Ct. 227, 238 (1985); *Cheyenne–Arapaho Tribes of Oklahoma v. United States*, 33 Fed.Cl. 464, 468 (1995)(recognizing 10th Circuit's finding of breach of trust).

■ These responsibilities fall upon the Secretary of Interior and the officials in the specialized subordinate agencies within the Interior Department. Those agencies have, in turn, promulgated regulations governing mineral leasing on tribal lands.

The provisions for leasing of tribal lands for mining that were in effect at the time plaintiff's cause of action accrued are set out in 25 C.F.R. Part 211 (1985). The procedures described within Part 211 cover all mineral leasing, not just coal. Like the statute itself, the regulations give extra attention to oil and gas leases. We mention this because plaintiff has proposed that management of coal leasing is indistinguishable from oil and gas leasing under *Pawnee v. U.S.*, 830 F.2d 187 (Fed.Cir.1987), *cert. den'd*, 486 U.S. 1032, 108 S.Ct. 2014, 100 L.Ed.2d 602 (1988), a case which we discuss momentarily.

Although the Navajo Nation has not specifically addressed many of these regulatory provisions, we have reviewed them at length. There are provisions on the manner of payments, inspections, penalties, fees, and cancellation. There are also a host of provisions governing mining operations, primarily for petroleum products. Finally, the item of interest here is addressed—royalties. With respect to royalties, sections 211.13, 211.16, and 211.17 contain very extensive and explicit procedures governing royalties *for oil and gas leases*, including criteria by which the Secretary is to set royalty rates for oil and gas leases. By comparison, the only provision governing royalties of coal, in particular, tersely states:

[f]or coal the lessee shall pay quarterly or as otherwise provided in the lease, a royalty of not less than 10 cents per ton of 2,000 pounds of mine run, or coal as taken from the mine, including what is commonly called "slack."

25 C.F.R. § 211.15(c). In glossing over these regulatory provisions, the Navajo Nation has necessarily failed to demonstrate how the Secretary violated his duty under the regulations, if such a duty is created by those provisions.

Plaintiff's briefs do make several references to regulations demonstrating a preference for competitive bidding over the negotiation of leases by tribal authorities. *See* 25 C.F.R. § 211.2. As plaintiff explains, the provision is designed to prevent overreaching by those negotiating with Indians and to assure that fair market value is obtained for tribal resources. Pl. Br. at 41, 44; Pl. Resp. at 46. Although the Navajo Nation cites case law demonstrating the point, it cites no decision of this Court, nor does it provide any authority for the proposition that violation of the regulation calls for money damages. In any case, the competitive bidding provision is inapposite. Such a provision by definition applies to the negotiation of a new leases among a number of potential lessees, not the renegotiation between lessor and lessee of a term in a pre-existing lease.

In addition to those procedures defined within the Code of Federal Regulations, the Navajo Nation has cited internal policies and procedures in the DOI Manual and Bureau of Indian Affairs Manual. Pl. Br. at 6. These manuals acknowledge the general duty to maximize income from Indian mineral leasing. Consistent with this goal, the manuals prescribe economic appraisals of the transactions between Indians and private companies such as Peabody.

We have on prior occasions recognized that the statutory and regulatory framework governing mineral leasing under IMLA requires the Secretary to use reasonable skill and care in maximizing economic benefits for the Indian lessors. *Cheyenne–Arapaho*, 33 Fed. Cl. at 468; *Navajo Tribe*, 9 Cl.Ct. at 238. However, IMLA has a second purpose—to

foster Indian self-determination. The legislative history indicates that prior to enactment of the IMLA Indians were on occasion compelled to lease land over their opposition. S. REP. No. 75–985, at 2. Accordingly, IMLA clearly stops short of turning over control to the Secretary, providing that "lands within any Indian reservation ... *may,* with the approval of the Secretary of the Interior, be leased for mining purposes, *by authority of the tribal council or other authorized spokesman ...*". 25 U.S.C. § 396(a)(emphasis added). The ideal of Indian self-determination is directly at odds with Secretarial *control* over leasing.

The lease itself reflects the measure of control assumed by the Navajo, and the correspondingly subordinate role of the Secretary: (1) the Secretary may suspend the lease for economic reasons, but only with the concurrence of the Navajo—Art VIII; (2) the lessee may not assign the lease without Secretarial and Navajo consent—Art XI; (3) the lessee's account books are open to Secretarial and Navajo inspection—Art XIII; and (4) the Navajo and the Secretary reserve the right to cancel the lease for violations of its terms by the lessee. And, of course, the Secretarial power to adjust rates after twenty years is conferred by the lease—Art. VI. *See* Lease 8580 (Feb. 1, 1964).

### Navajo Coal Mining in Context

There is a wealth of case law presenting varying degrees of federal management of or control over the administration of Indian leases. The landscape includes the Supreme Court's decisions in *Mitchell I* and *Mitchell II* at the polar extremes. Finding their place along the resulting continuum, the cases of *Brown v. United States,* 86 F.3d 1554 (Fed.Cir.1996), *Wright v. United States,* 32 Fed.Cl. 54 (1994), and *Pawnee v. United States,* 830 F.2d 187 (Fed.Cir.1987), *cert. denied,* 486 U.S. 1032, 108 S.Ct. 2014, 100 L.Ed.2d 602 (1988), provide useful correlations. *Wright* and *Brown* both involve leasing activity by Indians on allotted lands. In *Wright,* the limited Secretarial "approval only" role was insufficient to invoke the jurisdiction of the Court. Conversely, the statutory scheme in *Brown* permitted the Secretary to cancel a lease without the consent of

the Indian lessors, and was considered sufficient for jurisdiction.

In *Mitchell I,* the Supreme Court evaluated this Court's jurisdiction over claims arising from the government's alleged mismanagement of timber resources on land allotted to Indians under the Indian General Allotment Act of 1887, 25 U.S.C. § 331 et seq., and found it wanting. Specifically, the Court examined whether a trust duty to manage these resources was comprehended by the General Allotment Act. In holding that the Act created only a limited trust relationship between the government and Indian allottee, the Supreme Court reversed the Court of Claims' *en banc* recognition of a fiduciary duty which conferred jurisdiction. *Mitchell I,* 445 U.S. at 542, 100 S.Ct. 1349. Although land allotted to Indians was to be held in trust by the government, that particular legislation left it to the Indian allottee to use the land for agricultural and grazing purposes. Therefore, reasoned the Supreme Court, "the Act does not *unambiguously* provide that the United States has undertaken full fiduciary responsibilities as to the management of allotted lands." *Id.* (emphasis added).

Upon remand, however, the Court of Claims found that a host of other statutes and regulations governing everything from timber sales to conservation responsibilities created the specific fiduciary duty found lacking under the general allotment scheme. *Mitchell v. United States,* 229 Ct. Cl. 1, 664 F.2d 265 (1981). The Supreme Court ultimately agreed, holding that the "'comprehensive' responsibilities of the Federal Government in managing the harvesting of Indian timber" gave rise to an expectation of benefit sufficient to confer jurisdiction on this Court for breach of those responsibilities. *Mitchell II,* 463 U.S. at 222–24, 103 S.Ct. 2961 (citation omitted).

The statutes and regulations cited in *Mitchell II* illustrate pervasive governmental control and daily supervision over the management and sale of forest products on allotted land—comprehensive regulations "addressed virtually ever aspect of forest management" and conditioned approval of timber sales on compliance with their requirements. *Mitchell II,* 463 U.S. at 219–

22, 103 S.Ct. 2961. Therefore, this Court clearly has jurisdiction over breach of trust claims where the corpus of the trust is a resource over which "[v]irtually every stage of the process is under federal control." *Id.* at 222, 103 S.Ct. 2961 (quoting *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 147, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980)).

In the aftermath of *Mitchell I* and *Mitchell II,* claims based upon fiduciary duties respecting the management of those resources are denied where the government's supervision and control over tribal resources is limited. Implicated in every instance is the delicate balance struck between exercising fiduciary responsibilities and respecting tribal sovereignty and self–determination.

The *Brown* case involved commercial leasing activity on allotted land. The Court of Appeals for the Federal Circuit evaluated the fiduciary relationship formed under the Indian Long–Term Leasing Act *(see also, Pawnee,* 830 F.2d 187 (Fed.Cir.1987)) and the Indian General Allotment Act *(see also, Mitchell I,* 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1979)). Acknowledging that the statutes and regulations did not confer upon the Secretary comprehensive management leasing under that scheme. It thus focused on the second prong in *Mitchell II.* The "management" test looks to the existence of a "comprehensive" scheme for there to be a trust relationship sufficient for our Court to have jurisdiction. By contrast, the "control" test has no such qualifiers. *See Brown,* 86 F.3d at 1560–61. The Federal Circuit held in *Brown* that the commercial leasing program gave the Secretary effective control over leasing of allotted lands which must be exercised for the benefit of the Indians. *Id.* at 1556, 1561. Under those circumstances, the Court found that the government had assumed an enforceable fiduciary duty sufficient for Court of Federal Claims jurisdiction. *Id.* at 1563.

In particular, the Court distinguished between mere "oversight power" to review transactions already negotiated and executed by others, and the broader authority over commercial leasing under the Indian Long–Term Leasing Act. *Id.* at 1566. Allottees, for example, were entitled to lease allotted lands only for certain statutorily prescribed purposes and only after seeking the permission of the Secretary of the Interior and complying with terms and forms dictated by the Secretary. *Id.* at 1561–62. Furthermore, under the commercial leasing scheme, the allottee could not cancel a lease without prior approval of the Secretary. By contrast, the Secretary was entitled to cancel a lease even over the protest of the Indian allottee-lessor. *Id.*

The regulations at issue here also require use of certain forms, an unremarkable requirement in our view. 25 C.F.R. § 211.30. Likewise, the regulations provide for Secretarial cancellation, but only for cause, an important distinction from the regulations in *Brown.* 25 C.F.R. §§ 211.27, 211.22. On the whole, IMLA and the 25 C.F.R. Part 211 regulations, especially as they relate to the leasing of coal, preserve the Indians' ability to enter into and cancel leases. As we noted earlier, IMLA sought to remedy situations in which "the Indians at no time ha[d] any voice in the granting of such leases." S. REP. No. 75–985 at 2; *see also, Crow Tribe of Indians v. State of Montana,* 650 F.2d 1104, 1112 (9th Cir.1981)(one aim of the 1938 Act was to give "tribal governments control over decisions to lease their lands and over lease conditions, subject to approval of the Secretary of Interior, where before the responsibility for such decisions was lodged in large part only with the Secretary.")

The regulatory scheme for coal stands in stark contrast to that for oil and gas. A number of cases have found the oil and gas program amounts to a jurisdictional trust. *Cheyenne–Arapaho Tribes v. U.S.,* 33 Fed.Cl. 464 (1995); *Pawnee,* 830 F.2d 187 (Fed.Cir. 1987); and *Assiniboine and Sioux Tribes,* 792 F.2d 782 (9th Cir.1986). That, however, has not happened as respects coal. *Compare, Navajo Tribe of Indians v. United States,* 9 Cl.Ct. 227 (1985)(Lydon, J.) (Court assumed the existence of a jurisdictional trust for minerals in general, but without extensive analysis). Unlike the commercial leasing in *Brown,* mineral leasing under IMLA requires the consent of the Indian lessor before the Secretary may take actions affecting the lease. *See, e.g.,* 25 CFR

§ 211.14a (Secretary may authorize suspension of mining operations only after obtaining the consent of the tribe).

In *Wright*, this Court found jurisdiction lacking. There, we revisited the allotment regulatory scheme, this time in relation to the leasing and permitting of Indian allotted lands. In an attempt to escape the result reached in *Mitchell I*, the plaintiff in *Wright* focused upon the Secretary of Interior's power to authorize leases, arguing that this role extends the Secretary's relationship beyond a bare or generalized trust. However, the Court found that "the Government's role in leasing is limited to final review of leases negotiated by others." *Wright*, 32 Fed.Cl. at 58. Such a role, standing alone, is insufficient to create the type of fiduciary duty that can be enforced through a money remedy in this Court. *Id.* at 59. We concur.

Finally, there is the *Pawnee* case, in which federal responsibilities for management of oil and gas leases were at issue. Reversing this Court's holding to the contrary, the Federal Circuit found that the statutes and regulations established fiduciary duties that mandated compensation for breach. *Pawnee*, 830 F.2d at 190. Not only was there "comprehensive management," but there were also specific financial responsibilities, very much akin to those of private trustees. Like the Navajo Nation, the Pawnee tribe complained that the Secretary violated his fiduciary duty when he received royalties below market value. Even in the context of what we might describe as a "financial trust," the Court concluded that the Secretary's discretion in rate-setting did not obligate him to set the highest rate.

As we have noted, the statutory and regulatory context from which the *Pawnee* claims evolved is quite different from the coal regulatory scheme, and especially the general provision for royalty adjustment under IMLA. One of the statutes relied upon by the Pawnee is entirely dedicated to management of oil and gas royalties. The two statutes— the Indian Long–Term Leasing Act, 25 U.S.C. § 396 (1988) and the Federal Oil and Gas Royalty Management Act of 1982, 30 U.S.C. §§ 1701 (1988)—and a large body of regulations gave the Secretary broad author-

ity in leasing property and in collecting royalties on behalf of the Indians. In sum, those authorities clearly demonstrated that "the United States has exercised its supervisory authority over oil and gas leases in considerable detail." *Pawnee*, 830 F.2d at 190 (quoting *Poafpybitty v. Skelly Oil Co.*, 390 U.S. 365, 88 S.Ct. 982, 19 L.Ed.2d 1238 (1968)).

As under the IMLA scheme, the discretion vested in the Secretary by the statutory authority cited in *Pawnee* was to be exercised to serve the interests of the Indian trustees. However, the level of management and control exercised by the Secretary in the oil and gas leasing context more closely resembles that of the forest management scheme in *Mitchell II*, than the regulation of coal leasing at issue here. For instance, in describing the Indian Long–Term Leasing Act—one of two authorities invoked in *Pawnee*—the Court wrote:

> This statute places the Secretary of the Interior at the center of the leasing of Indian mineral lands. He determines whether to consent to a lease and the terms of the lease; he performs 'any and all acts' necessary to carry out the statute 'into full force and effect . . .'.

*Id.* at 189.

Furthermore, in *Pawnee* the Court cited a litany of regulatory provisions dealing specifically with aspects of the management of royalties, the very item of which those plaintiffs complained. In our case, the regulations and statutory provisions cited by the Navajo cover a range of issues from mining operations to rights-of-way, but touch only summarily on the topic of royalties. *See* Pl. Br. at 34 (*citing*, 25 C.F.R. Part 211 (1985); 25 C.F.R. Part 169 (1985); 25 C.F.R. Part 200 (1993); and 25 C.F.R. Part 216 (1985)).

### The Secretary's Duties Defined

Defendant concedes that the Secretary owes some measure of trust responsibility, but argues that the responsibility as it relates to coal royalties does not rise above a generalized trust obligation. We agree. Under *Mitchell II*, the contours of the trust responsibility are defined by statute and regulation. *See Brown*, 86 F.3d at 1563 (citing

*Pawnee,* 830 F.2d at 192, and *Mitchell II,* 463 U.S. at 224, 103 S.Ct. 2961). In order for a trust relationship to support an action for money damages, those "statutes and regulations must 'unambiguously provide that the United States has undertaken full fiduciary responsibilities' *as to the particular aspect of the relationship complained of."* *Wright,* 32 Fed.Cl. at 56 (quoting *Mitchell I,* 445 U.S. at 542, 100 S.Ct. 1349)(emphasis added).

Although the Federal Circuit in *Pawnee* found jurisdiction was proper, the Court upheld our rejection of the tribe's claim, ruling that the plaintiffs had failed to allege a specific violation of any of the duties imposed by statute or regulation. In doing so the Federal Circuit specifically refused to recognize a fiduciary obligation beyond that which springs directly from the pertinent statutes and regulations. *Pawnee,* 830 ·F.2d at 191–92.

The Navajo Nation's complaint suffers from the same shortcoming. Alleging breaches of general fiduciary duties, the Navajo have failed to link any breach to a specific money-mandating statutory or regulatory provision. For instance, the Navajo Nation has aptly demonstrated that the Secretary did not act as a proper trustee. But the Navajo fail to demonstrate a "breach of a specific duty that the regulations squarely place on the Secretary." *Brown,* 86 F.3d at 1563.

While the statute provides in general terms for the Secretary to maximize revenues and foster Indian self-determination, neither IMLA nor its implementing regulations, 25 C.F.R. Part 211, impose specific duties regarding the Secretary's adjustment of royalty rates for coal. In *Pawnee,* the trust responsibility was specifically tied to obligations—both statutory, 30 U.S.C. §§ 1701–57, and regulatory, 25 C.F.R. §§ 212.4, 212.12, 212.14, 212.16—respecting oil and gas royalty management, yet the complaint still failed. 830 F.2d at 189–90.

The Navajo Nation cites no provision *with respect to royalty-setting* that demonstrates federal *control* over that process. It is also quite apparent that IMLA does not involve the Secretary, even moderately, in every stage of the coal leasing process. In our case, the Secretary's role with respect to royalty adjustment, in particular, *derives solely from the terms of the lease:*

> the royalty provisions of this Lease are subject to *reasonable adjustment* by the Secretary of the Interior or his authorized representative at the end of 20 years from the effective date of this lease, and at the end of each successive ten-year period thereafter.

Article VI, Lease 8580 (emphasis added).

Other coal owned jointly by the Navajo and Hopi tribes was mined under leases (Navajo Lease 9910 and Hopi Lease 5743) with no royalty adjustment clause, and thus provided no occasion for Secretarial action on those royalty rates. By its very terms, the Navajo Nation lease did not call for a royalty rate adjustment until twenty years after its execution, and subsequent adjustments only every ten years. Even then, the Secretary's only guidance was to be "reasonable" in revising rates.

The plaintiff notes that as a matter of policy, DOI would not approve coal leases with royalties less than those the trustee would receive for its own coal—at that time and now, apparently, 12.5 percent. But even under that policy, the Secretary's obligations are limited to the *approval* of royalty provisions at specific junctures during a lease's life, which now is limited to ten years. Nowhere does that policy, nor any other policy, impose an affirmative duty to interject government-dictated royalty rates. I Pl.App. 183–84. And, of course, there is no claim by the Navajo nation that the 1987 approval of Lease 8580, with royalties of 12.5 percent, ran afoul of that policy.

It is perhaps unnecessary to note that we do not view *Mitchell II* as the threshold level of Secretarial management required to invoke our jurisdiction over these claims. *See Brown,* 86 F.3d at 1559 n. 6 (trial court appeared to have misapplied *Mitchell II* transforming "the descriptive into the prescriptive."). We find that the Secretary's role in the Navajo's coal leasing—that is, his control *or* supervision of coal leasing—falls far short of the detailed fiduciary responsibilities of *Mitchell II, Pawnee,* and *Brown,* on the

one hand, and is more akin to the general fiduciary responsibilities addressed in *Mitchell I* and *Wright,* on the other. And even if we were to find otherwise, the Navajo Nation has not alleged a breach of a specific trustee duty.

### Breach of Contract Claim

In its second claim for relief, plaintiff alleges that Lease 8580 constitutes a valid contract or contract-implied-in-fact between the United States and the Navajo Nation respecting the adjustment of the royalty. The Navajo further allege that this contract was breached when the government approved lease amendments which failed to adjust the royalties to a reasonable level, twenty percent being that level. In evaluating this claim for relief we look not to trust duties, or duties imposed by treaty, statute, regulation, or policy. Rather we search the record for evidence of an independent contractual obligation assumed by the Secretary in Lease 8580. We find none.

We note at the outset that although the issue is ripe for decision, plaintiff has not moved for summary judgment on its second claim for relief; the government, however, has done so in its cross-motion. Initially, the breach of contract claim was not briefed sufficiently. At the oral argument on the breach of trust claim, the Court requested briefs on the merits of the breach of contract claim and later heard oral argument.

The government offers five reasons for judgment as a matter of law: (1) The Secretary is not a party to the lease; (2) the lease's authorization to adjust the royalty rate does not amount to a binding contractual obligation; (3) the Secretary fulfilled any contractual obligation when Mr. Dodge first adjusted the royalty to twenty percent; (4) the decision adjusting the royalty was vacated at the Navajo Nation's request when it sought approval of the negotiated rate; and (5) the contract claim is barred by the statute of limitations. We have already rejected the statute of limitations argument in relation to the first claim for relief, and we do so again for the reasons previously stated.

Except for the first two arguments, the government's grounds for summary judgment in large part go to the issue of breach. We do not reach that issue because we find as a matter of law that the government owed no contractual obligation toward the Navajo Nation. In order for a contract, whether express or implied, to be binding upon a party we must find mutual intent to contract demonstrated by an unambiguous offer, acceptance, and consideration. *Trauma Service Group v. United States,* 104 F.3d 1321, 1325 (Fed.Cir.1997). These elements are not present. We find no intent on the part of the Secretary to assume a contractual obligation, and we find no consideration—both essential to the formation of a written or an implied contract.

### Contract Formation and Lease 8580

▮ Lease 8580 was executed by the Chairman of the Navajo Tribal Council and the Vice President of Sentry Royalty Company, Peabody's predecessor in interest. The terms of the lease clearly designate the tribe as lessor and Sentry as lessee. Plaintiff relies on explicit provisions within the lease, primarily Article VI, to hold the government contractually bound. Article VI is entitled "Termination of Federal Jurisdiction." The pertinent clause simply made the royalty provisions of Lease 8580 "subject to reasonable adjustment" by the Secretary at various infrequent junctures (at the twenty-year mark and every ten years thereafter) during the life of the lease. It does not by its terms suggest a contractual obligation.

The remaining lease provisions present an even less compelling case for the assumption of contractual liability. In fact, one can highlight every reference to the Secretary and arrive at the same conclusion—the language of the contract does no more than confirm the Secretary's role under IMLA. *See* Lease 8580, Art. VIII (when permitted by law and with the concurrence of the Navajo, Secretary may suspend mining operations in the event of unsatisfactory economic conditions or inadequate marketing facilities); Article XI (prohibiting assignment of the leasehold interest by the lessee without the prior approval of the Secretary and the Navajo); Articles XVI and XXIV (authorizing the Secretary to nullify lease in the event lessee fails to comply with its covenants or uses the

property for unlawful conduct); and Article XIII (providing that leasehold property and lessee's accounts "shall be open at all times for inspection by agents of Lessor or any duly authorized representative of the Secretary of Interior.") While Article VI and the remaining provisions cited by the Navajo Nation call for Secretarial involvement in various aspects of the administration of the lease, nothing in those provisions makes the United States a party to that contract.

In 1964, the Assistant Area Director of the Bureau of Indian Affairs approved the lease that had been executed by Navajo and Sentry. This approval, like the approval 23 years later of the lease amendments, was no more than the fulfilment of the Secretary's statutory duties, and evidenced no intent to contract. Defendant makes this very point, relying upon language in both *Poafpybitty v. Skelly Oil Co.,* 390 U.S. 365, 372, 88 S.Ct. 982, 19 L.Ed.2d 1238 (1968), and *United Nuclear Corp. v. Clark,* 584 F.Supp. 107, 108 (D.D.C.1984), restricting the Secretary's ability unilaterally to enter into a mineral lease or extend its terms. The rationale for the restrictions was the same in both instances— the Secretary was not the lessor, notwithstanding the fact that Secretarial approval was required. *Poafpybitty,* 390 U.S. at 372, 88 S.Ct. 982.

 When the Secretary reviews and approves mineral leases as part of his statutory responsibilities, he does not become a lessor or a lessee. We believe this to be the general rule, absent specific statutory authority to the contrary. *See Poafpybitty* and *United Nuclear Corp., supra; see also, Sangre de Christo Devel. Corp. v. United States,* 932 F.2d 891, 895 (10th Cir.1991)(statute providing for approval of Indian lease "is no different than many other federal statutes that require federal approval of private agreements"), *cert. denied,* 503 U.S. 1004, 112 S.Ct. 1760, 118 L.Ed.2d 423 (1992). We are unaware of any authority to the contrary, and plaintiff has not pointed us to any.

### Consideration

Even were there an intent to assume a contractual obligation, there still must be consideration—a bargained for exchange—in order to create a contractual obligation. *See generally,* RESTATEMENT (SECOND) OF THE LAW OF CONTRACTS §§ 71–81 (1981). The lease clearly sets out the "consideration" supporting the agreement at the beginning of the instrument. Lease 8580, Article I ("Consideration"). The paragraph identifies an exchange of benefits between the lessor and lessee, but makes no mention of the United States. By its terms, the lease suggests no benefit flowing to the United States.

In an effort to demonstrate consideration enuring to the government's benefit, plaintiff sets forth facts which are not in dispute, but which we do not find compelling: First, that public utilities rely solely on the lessee's coal-mining operations; and second, that the United States Bureau of Reclamation owns a 24.5 percent beneficial interest in one of the utilities relying on the Navajo coal. Plaintiff would have us take notice that increases in the royalties paid the Navajo will be borne by the utilities and consumers. *See* Plaintiff's Summary of Facts Relating to Contract Claim. This is not particularly relevant to the issue of consideration, but the inference tends to demonstrate a potential conflict of interests on the part of the government.

A reasonable inference can be drawn that the Secretary of the Interior derived some intangible benefit in the continued execution of the Lease 8580. We grant that "[t]he 8580 Lease was and is one important part of a larger initiative to provide electricity and water to the American Southwest by the United States Bureau of Reclamation and the owners of the Mojave and [Navajo Generating Station] plants . . .". Consolidated Statement of Proposed Uncontroverted Facts. One could conclude that the Secretary's role in enforcing the covenants of the lease and in ensuring a reasonable royalty rate confers the public benefit of sustaining the energy needs of the region. And to the extent the lease provided economic benefits to the Navajo, the Secretary's obligations to that Indian community were also furthered. This does not carry the argument, however. These objectives fall well within the ambit of the Secretary's executive responsibilities. They do not demonstrate independent con-

sideration supporting the government's "promise" to adjust rates.

### Contract Implied–in–Fact

In its First Amended Complaint the Navajo Nation pled alternatively that the lease gave rise to a contract implied-in-fact. Such a contract may spring from the Navajo Nation's recourse to the rate-setting mechanism and the government's assumption of the responsibility to set a revised rate. Under this implied contract theory, once the Secretary assumed the responsibility to adjust the royalty· provisions of Lease 8580, he was required to act in good faith and with fairness to all parties. According to plaintiff this covenant of good faith and fair dealing "require[d] that any discretion granted the Government under Article VI be exercised reasonably." Pl. Opp. (Count II) at 9.

But we must first find the existence of an implied-in-fact contract binding the government. Plaintiff insists that such a contract may be found in the words and actions of the Navajo Nation and the United States. We disagree. For the government to be considered a party to a contract implied-in-fact we must find mutuality of intent to contract, consideration, lack of ambiguity in offer and acceptance—the same elements required for a written or express contract— and conduct by a government representative with actual authority to bind the government in contract. *City of El Centro v. United States,* 922 F.2d 816, 820 (Fed.Cir.1990), *cert. den'd* 501 U.S. 1230, 111 S.Ct. 2851, 115 L.Ed.2d 1019 (1991) (citations omitted); *see also Vines v. United States,* 30 Fed.Cl. 711, 714 (1994)("the facts and circumstances of the case must show that 'the parties have taken upon themselves corresponding obligations and liabilities and have come to a meeting of [the] minds.' ")(quoting *Commonwealth of Kentucky v. United States,* 27 Fed.Cl. 173, 176 (1992)). On the evidence before us, each of these elements fails for the very same reasons we have enunciated regarding plaintiff's express contract theory. If, as we have found, Lease 8580 does not create a contractual obligation on the part of the Secretary, we are at a loss as to how the Secretary's assumption of the rate-revision function and then his abandonment of that

function, plus his later approval of the amendments, create a contractual obligation. The Navajo Nation has not demonstrated how the implementation of a non-contractual function creates a contractual obligation.

In conclusion, we find plaintiff's claim of breach of contract lacking in at least three respects: The Secretary's approval of the 1964 lease with the Article VI provision for subsequent adjustment was based on his statutory responsibilities and evidenced no intent to assume a contractual obligation; there was no consideration to support an agreement by the government; and the assumption of the rate-setting function of Article VI created no contractual obligation.

### CONCLUSION

The facts of this case show that the Secretary acted in the best interests of a third party and not in the interests of the beneficiary to whom he owed a fiduciary duty—a classic violation of common law fiduciary obligations. Nonetheless, the Navajo Nation has failed to present statutory authority which can be fairly interpreted as mandating compensation for the government's fiduciary wrongs. Defendant has thus established its right to judgment as a matter of law. Further, the Court finds that the government did not enter into a contract with Navajo Nation either by the express terms of Lease 8580 or by implication.

Accordingly, defendant's motions for summary judgement with respect to plaintiff's breach of trust claim and its breach of contract claim are GRANTED. The Clerk of Court is directed to enter judgment for defendant and dismiss plaintiff's First Amended Complaint.

### APPENDIX

TO: John W. Fritz

FROM: Don Hodel

RE: Appeal of Navajo Area Director's Adjustment

Of Royalty, Lease No. 14–20–0603–8580

I have reviewed the attached letter from Mr. C.G. Farrand of Peabody Holding Com-

pany, Inc. While I do not necessarily agree with all of its points, there would appear to be significant advantages to be derived from the successful renegotiation of the royalty rate under the above lease by the parties to that agreement. Any royalty adjustment which is imposed on those parties without their concurrence will almost certainly be the subject of protracted and costly appeals. The ultimate outcome could well impair the future of the contractual relationship established by the parties under the current lease.

Therefore, I suggest that you inform the involved parties that a decision on this appeal is not imminent and urge them to continue with efforts to resolve this matter in a mutually agreeable fashion.

As I understand the facts surrounding this appeal, in June 1984 the BIA Area Director adjusted the royalty rate on Lease No. 14–20–0603–8580 from 37.5 cents per ton to 20 percent of the value of coal. This occurred at a time when the coal company and the Navajo Tribe were actively engaged in negotiations involving both a lease extension and a royalty rate adjustment. In fact, I understand that these negotiations had begun as early as late 1979 (several years before it was necessary to consider readjustment) and that the royalty rate which the lessee was offering was in the vicinity of the 12.5 percent which is currently required on surface coal mining leases on federal land. The lessee (Peabody Coal) appealed the Area Director's decision.

From the filing of that appeal until the present time, the Navajo Tribe and Peabody have been meeting in an attempt to negotiate their way out of a somewhat complex legal dilemma.

I find it preferable to allow parties, with conflicting interests in the same matter, to have a sufficient amount of time to sit down and work out their differences. I believe this can be accomplished with respect to the issues currently subject to this appeal, therefore, a decision on the appeal at this time would be ill-timed.

I wish to assure you, however, that this memorandum is not intended as a determination of the merits of the arguments of the parties with respect to the issues which are subject to the appeal. If it becomes inevitable that such a determination must be made by the Department, then we can discuss it at that time.

MEMORANDUM FOR: JOHN FRITZ

FROM: DONALD PAUL HODEL

SUBJECT: APPEAL OF NAVAJO AREA DIRECTOR'S ADJUSTMENT OF

ROYALTY LEASE NO. 14–20–0603–8580

I have reviewed the enclosed letter from C.G. Farrand of Peabody Holding Company, Inc. While I do not necessarily agree with all of its points, there would appear to be significant advantages to be derived from the successful renegotiation of the royalty rate under the above lease by the parties to that agreement. Any royalty adjustment which is imposed on those· parties without their concurrence will almost certainly be the subject of protracted and costly appeals. The ultimate outcome could well impair the future of the contractual relationship established by the parties under the current lease.

Therefore, I suggest that you inform the involved parties that a decision on this appeal is not imminent and urge them to continue with efforts to resolve this matter in a mutually agreeable fashion.

As I understand the facts surrounding this appeal, in June 1984 the BIA Area Director adjusted the royalty rate on Lease No. 14–20–0603–8580 from 37.5 cents per ton to 20 percent of the value of coal. This occurred at a time when the coal company and the Navajo Tribe were actively engaged in negotiations involving both a lease extension and a royalty rate adjustment. In fact, I understand that these negotiations had begun as early as late–1979 (several years before it was necessary to consider readjustment) and that the royalty rate which the lessee was offering was in the vicinity of the 12.5 percent which is currently required on surface coal mining leases on Federal land. The lessee (Peabody Coal) appealed the Area Director's decision.

From the filing of that appeal until the present time, the Navajo Tribe and Peabody have been meeting in an attempt to negotiate their

way out of a somewhat complex legal dilemma.

I find it preferable to allow parties, with conflicting interests in the same matter, to have a sufficient amount of time to sit down and work out their differences. I believe this can be accomplished with respect to the issues currently subject to this appeal; therefore, a decision on the appeal at this time would be ill-timed.

I wish to assure you, however, that this memorandum is not intended as a determination of the merits of the arguments of the parties with respect to the issues which are subject to the appeal. If it becomes inevitable that such a determination must be made by the Department, then we can discuss it at that time.